**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| **PLAINTIFF,** | |
| v. | |
| **JAMES O'REILLY, MARTIN CUTLER and JAMES P. McALUNEY,** | Civil No.: |
| **DEFENDANTS** | |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## BACKGROUND

1.  From approximately December 2007 until July 2009, James O'Reilly, Martin Cutler, and James P. McAluney ("Defendants") solicited investors through a series of Rule 506 Regulation D offerings in Shale Synergy, LLC ("Shale"), Shale Synergy II, LLC ("Shale II"), and Ranch Rock Properties, LLC ("Ranch Rock"), an entity controlled by Black Rock Acquisitions, LLC ("Black Rock"), with the stated purpose of investing in oil and gas interests. Although Defendants represented to investors that their funds would go towards purchasing oil and gas investments, the majority of the funds were instead transferred to Joseph S. Blimline ("Blimline") and various Blimline-controlled entities. Throughout Defendants' solicitations, Blimline acted as a secret partner. Defendants never disclosed Blimline's involvement or his past securities disciplinary action to investors in Shale, Shale II, or Ranch Rock.

2. Defendants represented to investors that they were the managing members who made decisions regarding the use of investor funds. That representation was false, Blimline controlled all decisions made by Shale, Shale II, Black Rock, and Ranch Rock. Defendants also failed to disclose that funds for the offerings would be commingled. Of the approximately $16 million raised in the first three offerings roughly $13 million went to Blimline or Blimline entities. Out of the $16 million, $5.2 million consisted of promissory notes originally issued by Carole Petroleum, LLC ("Carole") and J2 Investments, LLC ("J2"), both Blimline-controlled entities, which were then "rolled" into Shale.

3. Defendants represented to investors that Shale would acquire the promissory notes issued by Carole and J2 and acquire substantially all of J2 and Carole's underlying assets. That representation was false; Shale did not acquire any of the assets of J2 or Carole.

4. By the conduct detailed in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5]. Unless enjoined, Defendants are likely to commit such violations again.

5. Through the sale and offer of Shale and Shale II securities, Defendants violated Section 5(a) and 5(c) of Securities Act [15 U.S.C. § 77e(a) and (c)]. Unless enjoined, Defendants are likely to commit such violations again.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this action under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].

7. Defendants, directly or indirectly, used the means or instruments of interstate commerce, the mails, or the facilities of a national securities exchange in connection with the acts described herein.

8. Venue is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of business occurred within this judicial district.

## DEFENDANTS

9. **James O'Reilly**, age 46, a Plano, Texas resident, was a founder and manager of Shale, Shale II, Black Rock, and Ranch Rock. O'Reilly was listed as the principal in charge of operations for Shale, Shale II, Black Rock, and Ranch Rock.

10. **James P. McAluney**, age 46, a Honolulu, Hawaii resident, was a founder and manager of Shale, Shale II, Black Rock, and Ranch Rock. McAluney was listed as the principal in charge of client relations for Ranch Rock and Black Rock.

11. **Martin Cutler**, age 46, a Santa Monica, California resident, was a founder and manager of Shale, Shale II, Black Rock, and Ranch Rock. Cutler was a minority owner of First Star Securities Corporations ("First Star").

### Related Entities

12. **Shale Synergy, LLC,** ("Shale") was a Texas limited liability company whose principal place of business was 16660 North Dallas Parkway, Suite 2300, Dallas, Texas. Shale was formed in December 2007 and purported to engage in all aspects of the oil and gas business, including acquiring real estate, oil and gas leases and mineral interests, and participating in exploration and development activities. O'Reilly, McAluney, and Cutler were the founders, managers and principals of Shale.

13.     **Shale Synergy II, LLC,** ("Shale II"), was a Texas limited liability company whose principal place of business was 16660 North Dallas Parkway, Suite 2300, Dallas, Texas. Shale II was formed in October 2008, and purported to engage in all aspects of the oil and gas business, including acquiring real estate, oil and gas leases and mineral interests, and participating in exploration and development activities. O'Reilly, McAluney, and Cutler were the founders, managers and principals of Shale II.

14.     **Black Rock Acquisitions, LLC**, ("Black Rock"), was a Texas limited liability company whose principal place of business was 16660 North Dallas Parkway, Suite 2300, Dallas, Texas. Black Rock was formed in December 2007. Black Rock was the parent company to Ranch Rock and purported to be a land management company that was primarily focused on clean domestic energy. O'Reilly, McAluney, and Cutler were founders, managers and board members of Black Rock.

15.     **Ranch Rock Properties, LLC,** ("Ranch Rock"), was a Texas limited liability company whose principal place of business was 16660 North Dallas Parkway, Suite 2300, Dallas, Texas. Ranch Rock was formed in April 2008, purportedly to acquire real property which it intended to sell or lease separately from the surface and sub-surface rights of properties for a variety of interests, including, but not limited to, water rights, natural gas mineral rights, pipeline rights-of-way, wind farming, farming, ranching, hunting and fishing leases. O'Reilly, McAluney, and Cutler were the founders, managers, and principals of Ranch Rock.

16.     **First Star Securities Corporation,** ("First Star") was a registered broker-dealer, registered with both the Commission and Financial Industry Regulatory Authority ("FINRA") from September 11, 2001 until it terminated its registration in January 2010. First Star was an

affiliate of Ranch Rock, and the managing broker-dealer for the offering.  Cutler owned a minority interest in First Star, paid for by Carole, a Blimline entity.

17. **Joseph S. Blimline**, served as an undisclosed principal in Shale, Shale II, Black Rock, and Ranch Rock and was the primary beneficiary of investor funds.  Blimline was heavily involved in the day-to-day activities and management of Shale, Shale II, Black Rock, and Ranch Rock, but was not identified in any offering documents.

18. **Blimline Entities** were a series of purported oil and gas companies operated and controlled by Blimline which received investor funds, and occasionally sold assets or real property to Shale, Shale II, and Ranch Rock.  Blimline's entities included: J2, Carole, Red River Operators, LLC ("Red River"), Deer Valley Production Company ("Deer Valley"), Winter Park Production Company, LLC ("Winter Park"), Jimbar Ranch, LLC ("Jimbar"), and Brassbar Ranch, LLC ("Brassbar").  The Blimline entities had outstanding loan balances to Shale, Shale II, and Ranch Rock of over $16 million as of September 2009.

## FACTS

### DEFENDANTS BEGAN INVESTING WITH BLIMLINE

19. The Defendants were first introduced to the oil and gas industry in 2006 when they began investing in Blimline's entities, Winter Park, J2, and Carole.  Blimline subsequently gave each of the Defendants an ownership interest in Carole for their efforts in soliciting new Carole investors.

20. In the summer of 2007, Blimline told the Defendants that he wished to liquidate the assets of J2 and Carole to pay investors back because he no longer wanted the responsibility of interfacing with investors or the administrative duties, including sending out investor

repayments.  Alternatively, Blimline proposed that Defendants should create their own company to manage investors.

21. As a result of that conversation, Defendants created Shale in December 2007. Shale's veiled purpose was to be a vehicle to allow Defendants to continue investing with Blimline, but relieve Blimline of the administrative duties of having to run his investment programs and the burden of having to interface with investors.

22. Defendants planned to handle investor relations and solicit new investors while Blimline would continue to make all decisions regarding the use of investor funds.

### DEFENDANTS FORM SHALE SYNERGY, LLC

23. Shale was designed as a $20,000,000 offering, claiming an exemption from registration under Regulation D, Rule 506.  The Shale Private Placement Memorandum ("PPM") offered both Class A and Class B membership units for $5,000 per unit with a minimum investment of $25,000.  Class A membership units paid a preferred distribution at the rate of 7.5% quarterly, paid quarterly, with redemption one year after issuance.  Class B membership units paid a preferred distribution at the rate of 9.0% per quarter, paid quarterly, with redemption two years after issuance.

24. In March 2008, Carole and J2 investors were given the option of converting their principal and/or interest into a Shale investment, or redeeming their J2 or Carole investments. Carole and J2 investors were told that the assets would be transferred to Shale.  A majority of the Carole and J2 investors were convinced to convert their promissory notes from Carole or J2 to Shale investments.

25. Defendants agreed to exchange approximately $5-6 million dollars of outstanding promissory notes from J2 and Carole investors for Class A and Class B membership units in Shale.

26. The Shale PPM stated, "[t]he Company intends to use the debt to acquire substantially all of the entity's underlying assets, most of which will be of the nature and scope for which the Company will acquire as described herein with the use of proceeds from this Offering." However, the assets were never transferred from Carole or J2 to Shale.

27. Between April 2008 and September 30, 2008 Shale raised between $7 and $8 million from new investors.

28. Although not listed as a principal of Shale, Blimline made the decisions regarding the use of investors' funds.

29. The Shale PPM did not disclose Blimline's involvement with Shale, or that his entities would receive a majority of investor funds.

## DEFENDANTS FORM SHALE SYNERGY II, LLC

30. In October 2008, after closing Shale on September 30, 2008, Defendants began offering Shale II to investors.

31. Shale II was a smaller, $5,000,000 offering. Shale II offered Class A membership units paying preferred distributions at a rate of 7.0% per quarter, paid quarterly, with redemption by Shale II at the end of twenty-four months. Shale II also offered Class B membership units paying preferred distributions accruing at the rate of 24% per annum, paid upon redemption, which was six months after issuance. Class A membership units required a $25,000 minimum investment, while Class B required a $100,000 minimum investment.

32. The business plan of Shale II was identical to Shale except the terms of the offering had changed to a six-month or two year offering.

33. Between November 2008 and February 19, 2009 Shale II raised approximately $2,300,000.

34. Although not listed as a principal of Shale II, Blimline made the decisions regarding the use of investors' funds.

35. The Shale II PPM did not disclose Blimline's role with Shale II or that his entities would receive a majority of investor funds.

### DEFENDANTS MADE MATERIAL MISREPRESENTATIONS ABOUT THE SHALE ENTITIES' BUSINESS MODEL

36. Both Shale and Shale II ("Shale Entities") investors were told that their specific entity would purchase and own legitimate oil and gas assets that would generate enough cash flow to pay the preferred distributions on the investment.

37. Defendants all met with potential Shale Entity investors. Defendants told investors that the Shale Entities were separate entities and each would use investor funds to acquire interests in assets that would be owned by the entity they invested in.

38. These representations were false. In fact, the Shale entities used very little of the investors' money to acquire oil and gas properties or interests. Instead, Shale Entities, under the control of Blimline, O'Reilly, McAluney, and Cutler, made improper unsecured "loans," collectively exceeding $14 million to Blimline-controlled entities.

39. Investors would wire funds directly to a Shale Entity account or would send a check to the Shale entities' office. Upon receipt of investor funds, O'Reilly would transfer the funds to a Blimline entity account at Blimline's request.

40. According to the promissory notes, the purpose of the loans was to participate in a pipeline transaction repair and natural gas transport in the state of Texas, however, there was no pipeline transaction.

41. Defendants never required financial statements from J2 or Carole, or investigated J2 or Carole's ability to repay the unsecured loans.

42. Even after Carole and J2 stopped making payments on the Shale loans, Defendants continued to lend investor funds to J2 and Carole on an unsecured basis.

43. In June and September 2008 Shale paid quarterly distributions. The majority of funds used to make the initial distributions were provided by Blimline entities.

44. Shale was unable to make its December 2008 distribution to investors until March of 2009.

45. After the December 2008 payment was made in March 2009, all investor quarterly distribution payments ceased.

46. Although Shale was delinquent in making the December 2008 payments Defendants continued to solicit new investors for Shale II.

47. Although Shale II had the same business model as Shale, Shale II investors were not told that Shale had been unable to make investor payments.

48. On January 26, 2009, McAluney informed O'Reilly and Cutler that the problems at Shale and Shale II were due to debt service cost and the inability to flip leases quickly. McAluney proposed an immediate liquidation of assets to start paying investors back their principal.

49. On February 13, 2009, O'Reilly sent a letter to all Shale investors stating that the reason for failing to make a fourth quarter 2008 investor payment was primarily due to the credit crisis.

50. On that same day, February 13, 2009, McAluney sent O'Reilly and Cutler an email stating that the business model of Shale Entities no longer worked.

51. Despite being unable to make investor payments and knowing there were serious problems at Shale, Defendants continued to solicit new Shale II investors.

52. The last Shale II investor made an investment on approximately February 19, 2009.

53. Blimline provided funds for Shale II to make a quarterly investor payment in December 2008, with its last quarterly investor payment in March of 2009.

54. Investors in Shale and Shale II received no further payments of principal or interest after March 2009.

55. Defendants knew that Blimline, their secret partner and key to the Shale Entities' success, was a principal of Carole and J2, and was subject to a cease and desist order prohibiting him from offering securities or selling unrestricted non-exempt securities issued in the state of Michigan. Because of this, Blimline was intentionally not named as an officer, director, or key employee of Shale Entities, and was not listed in the PPMs.

### THE SHALE OFFERINGS WERE NOT EXEMPT FROM REGISTRATION

56. Defendants sold the Shale offerings to both accredited and non-accredited investors, keeping the number of non-accredited investors to under thirty-five per offering.

57. However, potential investors were not provided with the type of information that registration would provide, such as audited financial statements, balance sheets, or disclosure statements.

58. The Shale Entities did not have audited financial statements, so Defendants did not and could not have provided audited financial information statements to investors, as required under Regulation D Rules 502(b) and 506. The information provided to investors did not give investors access to the financial and disclosure statements they would have received through registration; therefore, the offering did not meet the standards which must be met to qualify for exemption under Section 4(2) of the Securities Act.

### DEFENDANTS CREATE RANCH ROCK PROPERTIES, LLC

59. In December 2007, Defendants formed Black Rock Acquisition to act as the parent company to their Rule 506 offerings. Black Rock purported to be primarily a land management company.

60. The first offering issued by Black Rock was Ranch Rock. Although formed in April 2008, Ranch Rock did not begin to solicit investors until late 2008.

61. Ranch Rock differed from the Shale Entities in that it was offered through registered broker-dealers. First Star was the managing broker-dealer for the sale of Ranch Rock.

62. Defendants created the Ranch Rock PPM and marketing materials and provided the information to broker-dealers.

63. Defendants, through First Star, signed selling agreements with other registered broker-dealers.

64. In the spring of 2008, Cutler purchased a minority interest in First Star using funds lent to him by Carole.

65. For its services, First Star received a syndication management fee of 3% of the gross offering proceeds and a due diligence fee of 1.5% of the gross offering proceeds. Ranch Rock paid an 8% commission plus a 1% due diligence fee on the amount of subscription proceeds received through First Star or other securities broker-dealers who entered into selling agreements with First Star.

66. Ranch Rock offered Class A membership units at $5,000 per unit with a minimum investment of $25,000. Distributions began after the sixth full month at the rate of 18% per year, with distributions paid quarterly. Units were to be redeemed at the end of a twenty-four month term.

67. Between December 2008 and July 10, 2009 Ranch Rock raised approximately $1.3 million from 22 different investors.

68. The business model for Ranch Rock differed from Shale and Shale II. Ranch Rock purported to acquire land and strip off the mineral rights, sell those, participate or keep a royalty interest in some, and then lease the remaining land for farming, ranching, wind power, water, or other uses.

69. However, as with the Shale Entities, Blimline made the decisions on the use of Ranch Rock investor funds.

70. Ranch Rock lent a majority of investor funds to Blimline entities. A November 13, 2009 Ranch Rock balance sheet revealed that Ranch Rock held $1,150,000 in assets, $788,000 of which were receivables from Red River, a Blimline entity.

71. Defendants did not disclose to investors Blimline's involvement or his receipt of investor funds.

72. In an April 20, 2009 email, McAluney revealed to Cutler and O'Reilly that Shale and Shale II were approximately $2.5 million behind in investor payments.

73. Defendants did not disclose to investors in Ranch Rock that the Shale Entities were having financial difficulties and were unable to make investor payments.

74. While knowing the Shale Entities were unable to make payments to investors, Defendants were raising money for Ranch Rock.

75. O'Reilly would check the balances each day in the Shale, Shale II, and Ranch Rock bank accounts and transfer money between the accounts in order to meet expenses.

76. Investors in the Shale Entities and Ranch Rock were never told the funds would be commingled with Shale and Shale II funds to meet expenses.

## FIRST CLAIM

**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**Violations of Section 10(b) [15 U.S.C. § 78j(b) of the Exchange Act and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder**

77. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1-76, above.

78. Defendants, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices or courses of business that operated or would operate as a fraud or deceit.

79. Defendants' representations and omissions were material.

80. By reason of the actions alleged herein, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### EMPLOYMENT OF A DEVICE, SCHEME OR ARTIFICE TO DEFRAUD
### Violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]

81. The Commission realleges and incorporates by reference the allegations in Paragraphs 1-76, above.

82. Defendants, and each of them, by engaging in conduct described in Paragraphs 1-76 above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

83. By reason of the foregoing, Defendants, directly or indirectly, violated, and, unless enjoined, will continue to violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## THIRD CLAIM

### FRAUD IN THE OFFER AND SALE OF SECURITIES
### Violations of Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)]

84. The Commission realleges and incorporates by reference the allegations in Paragraphs 1-76, above.

85. Defendants, and each of them, by engaging in the conduct described in Paragraphs 1-76, above, directly and indirectly, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading, and engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

86. By reason of the foregoing, Defendants, and each of them, directly or indirectly, violated, and, unless enjoined, will continue to violate, Section 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

### FOURTH CLAIM

**VIOLATION OF THE REGISTRATION PROVISIONS OF THE SECURITIES ACT**
**Violations of Section 5(a) and 5(c) of the Securities Act with Sales of Shale and Shale II [15 U.S.C. § 77e(a) and (c)]**

87. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 76, above.

88. Defendants, O'Reilly, Cutler, and McAluney, and each of them, by engaging in the conduct described in paragraphs 1 through 76 above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, offered to sell or sold securities in Shale and Shale II or, directly or indirectly, carried such securities through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

89. No registration statements have been filed with the Commission or has been in effect with respect to these securities.

90. By reason of the actions alleged herein, Defendants directly or indirectly violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## **REQUEST FOR RELIEF**

Wherefore, the Commission respectfully requests that this Court:

**I.**

Issue findings of fact and conclusions of law that the Defendants committed the violations charged herein.

**II.**

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that preliminarily and permanently enjoin Defendants, and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**III.**

Enter an order directing Defendants, and each of them, to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief with the jurisdiction of the this Court.

Dated this 13th day of September, 2011.

Respectfully submitted,

/s/ Thomas Melton
Thomas Melton (Utah Bar No. 4999)
meltont@sec.gov
Daniel J. Wadley (Utah Bar No. 10358)
wadleyd@sec.gov
Paul Feindt (Utah Bar No. 8769)
feindtp@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Tel. 801-524-5796
Fax 801-524-5262

Local Counsel
Toby M. Galloway (Texas Bar No. 00790733)
gallowayt@sec.gov
Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102
Tel. 817-978-6447
Fax 817-978-4927